A92A2308. IN THE INTEREST OF J. C. J., a child.

(428 SE2d 643)

BLACKBURN, Judge.

A petition for termination of the parental rights of the parents of J. C. J. was filed in the Juvenile Court of Clayton County. The father, who had never lived with or taken responsibility for the child, voluntarily surrendered his parental rights. The mother appeals from the court's order terminating her rights.

The Department of Human Resources has a history of involve-

ment with the mother dating back to 1982. She has three adult daughters, all of whom were removed from her custody for extended periods of time, and a younger daughter and son, W. R. J. and J. C. J., who were thirteen and seven years of age respectively at the time of the hearing. W. R. J. and J. C. J. were removed from the home in September 1987 (when J. C. J. was three) because of physical abuse by a man who was living with the mother and lack of supervision by the mother. After an October 1987 order finding him a deprived child, J. C. J. lived in several foster homes and was hospitalized for almost a year because of severe emotional problems. He has lived with the same foster family since his release from the hospital in May 1990.

J. C. J.'s caseworkers, therapists, and psychiatrists testified concerning his special needs. He has emotional problems resulting in part from prior abuse and lack of stability in his life, and he also suffers from attention deficit disorder and a learning disability, which stem from neurological problems. He attends a specialized school program, participates in individual and group therapy, and is receiving medication for his disorders. He lives with a foster family trained to deal with special needs children. The witnesses explained that J. C. J. has high levels of hyperactivity and anxiety, experiences difficulty dealing with anger, and can become destructive and violent to himself and others, and that as a result he needs 24-hour supervision and a controlled, stable environment. Evidence was adduced that he becomes more anxious and violent before and after visits with his mother and court hearings concerning his status. The therapist testified that after observing the mother in therapy sessions, he had concluded that she had very little understanding of J. C. J.'s condition and did not have the parenting skills required to raise a child with his problems. The therapist explained further that J. C. J. was at great risk for antisocial and violent behavior, and the quality of his upbringing over the next few years would determine whether these tendencies could be checked. A caseworker opined that the mother's proposed plan for caretaking and supervision was inadequate for J. C. J.'s special needs. The therapist and caseworkers opined that J. C. J. needed a final resolution of his status to eliminate this uncertainty from his life, and they recommended that the mother's rights be terminated and that J. C. J. remain with the foster family, who expressed interest in adoption.

In 1987 and again in 1988 and 1990, the court ordered the mother to obtain housing and stable employment, to pay child support, to obtain substance abuse counselling and treatment, and to participate in J. C. J.'s therapy. The mother did not obtain housing until December 1991, when she moved into a two-bedroom apartment she was sharing with W. R. J. as of the May 1992 termination hearing. The mother, who has a seventh-grade education and limited job skills, has

been employed sporadically over the four-year period in question, and began a new job several months before the hearing. She has made only a few of the $10 per week child support payments ordered by the court. The mother has been convicted on charges of DUI and shoplifting and was on probation for shoplifting at the time of the hearing. Evidence was adduced that the mother has maintained the weekly visits with J. C. J. permitted by the court, but her participation in his therapy has been erratic. The mother testified that she has finally acknowledged her drinking problem and has been attending counselling sessions for approximately one year. In response to the court's prior order to set forth a plan for caring for J. C. J., the mother explained that her 13- and 19-year-old daughters would get him ready for school after she left for work at 6:00 a.m. and keep him after school and during the summers.

The decision to terminate parental rights is a two-step process. First, the court must determine "whether there is present clear and convincing evidence of parental misconduct or inability as provided in [OCGA § 15-11-81 (b)]." OCGA § 15-11-81 (a). If so, "the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child . . . including the need for a secure and stable home." Id. If parental rights have been terminated by the lower court, upon appellate review this court must determine "whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights had been lost." (Citations and punctuation omitted.) *In the Interest of J. M. C.*, 201 Ga. App. 173, 174 (410 SE2d 368) (1991).

The four elements necessary to a finding of "parental misconduct or inability" are set forth in OCGA § 15-11-81 (b) (4) (A). The mother agreed to stipulations in prior orders that J. C. J. was a deprived child because of the mother's lack of stable employment or housing, see OCGA § 15-11-81 (b) (4) (A) (i), and the evidence of prior drinking, criminal behavior, physical abuse, neglect, and repeated failure to comply with court-ordered plans authorized a finding that the deprivation resulted from the mother's lack of care or control. See OCGA § 15-11-81 (b) (4) (A) (ii), (B) (ii)-(v); see also *In the Interest of J. M. C.*, supra. Moreover, given the nature and severity of J. C. J.'s emotional and neurological problems and the testimony of the therapists and caseworkers, no question exists that continued deprivation will cause serious harm. See OCGA § 15-11-81 (b) (4) (A) (iv).

The remaining question is whether the cause of the deprivation is likely to continue or will not likely be remedied. See OCGA § 15-11-81 (b) (4) (A) (iii). While, as the mother contends, "past deprivation is not sufficient for termination without a showing of present depriva-

tion, the past conduct of the parent is properly considered by the court in determining whether such conditions of deprivation are likely to continue. [Cits.]" *In the Interest of J. L. Y.*, 184 Ga. App. 254, 257 (361 SE2d 246) (1987). Courts also may consider the need for stability in the child's life and the adverse effects on children who remain in foster care for long periods of time. Id. The special medical needs of a child and the parent's inability to provide for those needs likewise are proper subjects of inquiry for the courts. *In re M. L. G.*, 170 Ga. App. 642, 645-647 (317 SE2d 881) (1984).

Here, although the mother had obtained employment and an apartment shortly before the hearing, the juvenile court noted that she had repeatedly failed to comply with prior orders over a five-year period and further observed that the mother's efforts at compliance occurred only when a court hearing was scheduled. Given the evidence of the mother's past behavior and the length of time that had elapsed with no improvement in the situation, and considering further the severity of J. C. J.'s condition, his need for stability and constant supervision, and the mother's apparent inability to understand his problems or provide adequate care or supervision, the juvenile court had clear and convincing evidence that the conditions of deprivation were likely to continue. See *In the Interest of J. M. C.*, supra; see also *In the Interest of J. R.*, 201 Ga. App. 199 (410 SE2d 458) (1991); *In the Interest of J. L. Y.*, supra at 255-257 (2). Under these circumstances, we cannot say the juvenile court erred in terminating the mother's parental rights. See *In the Interest of J. R.*, supra at 201 (1).

*Judgment affirmed. McMurray, P. J., and Cooper, J., concur.*

DECIDED MARCH 3, 1993.

*Cowen & Cowen, Linda S. Cowen*, for appellant.

*Michael J. Bowers, Attorney General, William C. Joy, Senior Assistant Attorney General, Margot M. Cairnes, Staff Attorney, Foster & Foster, Michael D. Anderson*, for appellee.