601 S.E.2d 714 (2004)
268 Ga. App. 360
In the Interest of D.L. et al., children.
No. A04A0682.
Court of Appeals of Georgia.
June 15, 2004.
Reconsideration Denied July 7, 2004.
*715 William Warner, Snellville, Jennifer Wheeler, Brad Gardner, Dwight L. Thomas, P.C., Atlanta, for Appellant.
Thurbert E. Baker, Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, Assistant Attorney Generals, Cynthia Roberts-Emory, Stone Mountain, for Appellee.
SMITH, Chief Judge.
The father of D.L., B.L., and A.L. appeals from the termination of his parental rights by the Juvenile Court of DeKalb County. *716 The father challenges the juvenile court's order on the grounds that the juvenile court lacked "present clear and convincing" evidence of his misconduct or inability, that the juvenile court lacked clear and convincing evidence that termination of his parental rights would be in the children's best interests, that the juvenile court erroneously considered the recommendation of the citizens review panel in reaching its decision to terminate his rights, and that after a case plan was formulated the Department of Family and Children Services (DFACS) did not make reasonable efforts to reunite the family before filing termination proceedings. We find no merit in any of these enumerations, and we affirm the judgment terminating the father's rights.
On appeal, we construe the evidence in the light most favorable to the findings of the juvenile court, and our standard of review is whether a rational trier of fact could have found that the parent's rights should be terminated. The decision to terminate parental rights is a two-step process. First, the juvenile court must determine whether present clear and convincing evidence exists of parental misconduct or inability. OCGA § 15-11-94(a). Parental misconduct or inability may be found when (1) the children are deprived; (2) the cause of the deprivation is lack of proper parental care or control; (3) such deprivation is likely to continue or not likely to be remedied; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. OCGA § 15-11-94(b)(4)(A)(i)-(iv). If there is clear and convincing evidence of such parental misconduct or inability, the court must then consider whether terminating the parent's rights is in the best interests of the children, after considering the physical, mental, emotional, and moral condition and needs of the children, including the need for a secure and stable home. In the Interest of T.B., 249 Ga.App. 283, 286, 548 S.E.2d 45 (2001). The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. In the Interest of R.G., 249 Ga.App. 91, 95(1)(d), 547 S.E.2d 729 (2001).
The evidence of record shows that on May 28, 2001, the children's mother was reported missing. Her body was found on June 6, 2001, and her death was ruled a homicide. A DeKalb County police detective requested that the children be brought into care, alleging that the father had a history of substance abuse and that prior to her death the mother had expressed concern about leaving the children with him. B.L. and A.L. are twin girls who were then five years old. The juvenile court entered an order giving their temporary legal custody to the DFACS and directing a temporary priority placement for B.L. and A.L. in Florida with their maternal aunt. No visitation was permitted for the father, because he had not been ruled out as a suspect in the mother's death.
A detention hearing was scheduled for June 14, 2001, but was rescheduled to permit the father to retain counsel. Later on the same day, the father appeared at the DFACS office with his son, D.L., who was 11 years old, and he stated that he had come to see his daughters. According to the father, D.L. had been living with his paternal grandmother in New Jersey for two years and was in Atlanta because of his mother's death. Although the father appeared agitated, disorganized in his speech, and combative, he left the building when he was informed that he could not see his daughters. DFACS then sought legal custody of D.L., as well, and he was taken into care that day. At the detention hearing, held on June 19, 2001, the father admitted he needed financial help to keep the children. Although a random drug screen performed the same day was negative for marijuana and cocaine, witnesses reported that he had used crack cocaine since the mother's death. The twins' placement or "extended visit" with their maternal aunt was approved, as was D.L.'s "extended visit" with his maternal grandparents, who lived close to the maternal aunt in Florida. DFACS filed a deprivation petition on June 22, 2001. An adjudicatory hearing was held on July 25, 2001, and the juvenile court found the children deprived. The father refused to answer questions regarding his wife's death or his involvement in it, invoking his Fifth Amendment rights. He did not appeal this order.
*717 DFACS prepared a case plan for the father. He was to demonstrate his ability to care for the children by obtaining and maintaining employment; obtaining and maintaining a stable, clean, and safe home; obtaining child care; attending parenting classes; cooperating with a parent aide or family service worker; obtaining a substance abuse assessment and following recommendations made in the assessment; submitting to drug screens and showing six consecutive negative screens; obtaining individual or family counseling to deal with the grieving process and learn how he could support the children in this process; executing a release of information; attending all hearings, appointments, case plan reviews, and scheduled visits with the children when permitted; notifying DFACS of his whereabouts; and assisting DFACS in locating suitable relative placements. On September 25, 2001, a dispositional hearing was held, and an order was entered extending temporary legal and physical custody of the children until the following June.
DFACS apparently concluded that reunification was not appropriate, and on October 5, 2001, DFACS filed a petition to end reunification services. The father was served by publication, as he was not living at his home and had not notified DFACS of his whereabouts. The trial court granted the petition on December 18, 2001, finding that continuing efforts at reunification would not be in the children's best interests, given that the father had not maintained contact with DFACS, had not attended a substance abuse program, had not attended parenting classes, had not had a psychological evaluation, and had not appeared at the dispositional hearing. This order was not appealed.
On April 19, 2002, DFACS filed the petition for termination of parental rights, and the father was served at his mother's home in New Jersey. On May 23, 2002, the father was indicted by a DeKalb County grand jury on the charge of murdering his wife. A hearing on the termination petition was held on July 16, 2002. The father appeared at the hearing accompanied by his attorney, and the hearing resulted in the termination of his parental rights. The children were placed with the maternal aunt for adoption.
1. The father contends that the juvenile court did not have present clear and convincing evidence of his misconduct or inability. We need not consider his arguments concerning deprivation, because the order finding the children deprived entered on July 25, 2001, was not appealed. The father is therefore bound by that order. In the Interest of N.Q., 260 Ga.App. 118, 120(1)(a), 578 S.E.2d 920 (2003).
When the children are not in the custody of the parent whose rights are in jeopardy, the court considers whether that parent, without justifiable cause, failed significantly for a period of one year or longer prior to the filing of the termination petition to provide for the care and support of the child, as required by law or judicial decree, or to comply with a court ordered plan for reunification. OCGA § 15-11-94(b)(4)(C)(ii), (iii). Here, lack of proper parental care or control was shown to be the cause of the children's deprivation.
It is undisputed that the father did nothing toward the goal of reuniting with his children. The testimony of two caseworkers and the father himself demonstrates that he failed to achieve any of the goals in the case plan. The father argues that he could not work toward achieving the goals because he was not aware of them; he never signed the case plan and DFACS never gave him a copy or discussed it with him. This argument is specious. He will not be permitted to refuse to deal with DFACS or discuss the case plan with it and then claim that he could not work toward the reunification plan when he was not apprised of it. Extensive testimony was presented from both caseworkers regarding their efforts to get the father to come in to discuss the plan and his complete refusal to cooperate or even to maintain contact with DFACS. Even the father conceded that "[i]t could have been a possibility" that he did not contact DFACS, blaming his disgust with the agency.
The evidence also showed that the father had a history of illegal drug use and alcohol abuse. Witnesses testified concerning the father's recent use of crack cocaine. At the *718 deprivation hearing, a security guard at a motel testified that the father had come onto the property through a hole in the fence and was in a room known for drug activity, despite having been previously banned because of his drug activity. He appeared to the guard to be "skiied up" or under the influence of drugs or alcohol. The father's cousin testified that he had observed the father under the influence of alcohol in the presence of his children. And the father himself admitted under oath to having used marijuana and cocaine and to excessive alcohol use. He stated he had been to rehab at the VA Hospital and attended Alcoholics Anonymous meetings, but he also stated he had drunk a beer the day before. The father is correct when he states that his admission of substance abuse occurred almost one year before the termination hearing, but he never obtained a substance abuse assessment, received any more treatment, or did anything else to demonstrate that he was in a position to assume responsibility for the children's care.
In addition, during the time the children were in the legal custody of DFACS and in the physical custody of maternal relatives, the father provided no care or support for the children. By his own testimony at the detention hearing, he was not in a financial position to care for or support the children. He testified that he would have "no problem" with paying child support but argues that because it had never been brought up in court or otherwise, his failure should not be held against him. "A parent, however, has a statutory duty to support [his or] her children, with or without a court order. OCGA § 19-7-2." (Citation and punctuation omitted.) In the Interest of J.J., 259 Ga.App. 159, 162, 575 S.E.2d 921 (2003).
This evidence demonstrates more than amply that the father did not comply with the reunification plan, did not seek treatment for his chronic unrehabilitated substance abuse, and failed without justification to provide care and support for his children. The juvenile court did not lack present clear and convincing evidence of the father's parental misconduct or inability.
2. The father next maintains that the juvenile court lacked clear and convincing evidence on which to base a specific finding that termination of his parental rights would be in the best interests of the children. We do not agree.
Under Georgia law, the same factors that show the existence of parental misconduct or inability may also support a finding by the juvenile court that the termination of parental rights is in the children's best interests. In the Interest of B.L.H., 259 Ga.App. 482, 485(1), 578 S.E.2d 143 (2003). That is the situation here. Evidence was presented that the children's placement with their maternal aunt had worked out well, the children were thriving, and adoption by the aunt could be expected. Both child advocates recommended terminating the father's rights. The juvenile court properly concluded that terminating the father's parental rights was in the children's best interests.
3. The father argues that DFACS did not make reasonable efforts to reunite his family for a long enough time after the case plan was formulated before filing a petition to terminate his rights. It is true that when DFACS removes children from their parents, the parents must be given the opportunity to comply with a reunification plan before termination proceedings are initiated. In the Interest of M.R., 213 Ga.App. 460, 465-466(2), 444 S.E.2d 866 (1994). The father correctly points out that DFACS filed a petition to end reunification services and a case plan addendum a mere three and one-half months after the children were taken into care.
But M.R. was overruled in In the Interest of C.W.S., 231 Ga.App. 444, 447-448, 498 S.E.2d 813 (1998) because it was incompatible with this court's holding in In the Interest of A.M.B., 219 Ga.App. 133, 135-136, 464 S.E.2d 253 (1995). In A.M.B., we held that a juvenile court's consideration of a parent's failure to comply with a reunification plan when the plan has not been in effect for one year, while "inappropriate," is not reversible error. The circumstances presented here warranted an early end to reunification services.
*719 Absolutely no progress had been made since the case plan was proposed because the father was hostile and refused to communicate with DFACS regarding the plan. The father was arrested several times after his wife's death on other charges, both in Georgia and in New Jersey. He was facing trial for murder, he did not know when the trial would be held, and while he insisted he was innocent, he certainly could not predict the outcome of the trial. The juvenile court was given no time frame in which the father might be able to care for the children even if he were capable and willing. The children were making good progress in the care of their aunt, and the aunt was prepared to adopt them if the father's rights were terminated. Termination of the father's parental rights was certainly in the children's best interests, even though a full year had not passed since the case plan was proposed. Finally, the father did not oppose the petition to end reunification services or appeal the trial court's grant of the petition. He is therefore bound by it.
4. The father asserts that the juvenile court's mention of the citizen review panel's recommendation of termination renders the termination of his rights erroneous. He correctly points out that such reports include hearsay and cannot be considered by the juvenile court in determining whether the evidence supports terminating a parent's rights. They are not evidence. In the Interest of N.G., 257 Ga.App. 57, 61, 570 S.E.2d 367 (2002).
Nonetheless, we find no reversible error. No jury was present to be contaminated by the report. And in a nonjury trial, we must presume that the court is able to select and consider the properly presented evidence and dismiss the remainder. This court will reverse the court below only if no legal evidence supports the lower court's ruling. See In the Interest of C.G.B., 242 Ga.App. 705, 711(4), (5), 531 S.E.2d 107 (2000).
Because a rational trier of fact could have found that the father's rights should be terminated, we affirm the juvenile court's decision. In the Interest of C.N.S., 248 Ga.App. 84, 87, 545 S.E.2d 633 (2001).
Judgment affirmed.
JOHNSON, P.J., and PHIPPS, J., concur.